UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARC KEATING,<br><br>        Plaintiff<br><br>    v.<br><br>FRANK COSLETT, et al.,<br><br>        Defendants | CIVIL ACTION NO. 3:11-CV-0411<br><br>(SLOMSKY, J.)[1]<br>(MEHALCHICK, M.J.) |

**REPORT AND RECOMMENDATION**

This case arises out of an incident in which two police officers and a parole agent entered the home of the father of Plaintiff, Marc Keating, searched the home, and handcuffed and strip-searched Keating (who was present at the house at the time). Keating initiated this action with the filing of a Complaint on March 22, 2011. (Doc. 1). Keating filed an Amended Complaint on October 14, 2011, naming as Defendants the City of Pittston, Pennsylvania State Parole, Pittston City Police Officers Justin Tokar and Maivaun Houssein, and Pennsylvania Probation and Parole Agent Frank Agent Coslett, and alleging that his Fourth Amendment rights were violated by Defendants' illegal entry, search, seizure and arrest pursuant to 42 U.S.C. § 1983. (Doc. 18).

Following this Court's dismissal of Defendants City of Pittston and the Pennsylvania State Parole, Plaintiff was permitted to proceed against Defendants Officers Tokar and Houssein and Agent Coslett with respect to his illegal entry claim in Count I of his Amended

---

[1] District Court Judge Joel H. Slomsky of the Eastern District of Pennsylvania has been assigned this case pursuant to a designation by the Honorable Theodore A. McKee, Chief Judge for the Third Circuit Court of Appeals.

Complaint, and the illegal search and seizure claims set forth in Count II of the Amended Complaint. (Doc. 27 and Doc. 30). Pending before this Court are the motions for summary judgment of Defendants Officers Tokar and Houssein (Doc. 45) and Defendant Agent Coslett (Doc. 49). These motions have been fully briefed and are ripe for disposition.

I. **FACTUAL BACKGROUND**

Defendant Frank Coslett is a Pennsylvania State Parole agent based out of the Scranton district office. (Doc. 58-2, p. 3). Defendant Justin Tokar, at all relevant times, was a police officer with the Pittston Police Department. Defendant Maivaun Houssein, at all relevant times, was a police officer for the Pittston Police Department. Plaintiff, Marc Keating, is an individual who, at all relevant times, was subject to parole supervision as a result of a criminal conviction and had an approved residence listed with the Pennsylvania Board of Probation and Parole as 3 James Street, Pittston, Pennsylvania. (Doc. 50-2, p.38).

The conditions of Keating's parole included that his approved residence may not be changed without the written permission of the parole supervision staff. (Doc. 50-2, pp. 37, 52;[2] Doc. 48-2, p. 3). Additionally, the conditions of Keating's parole include an express consent by Keating "to the search of [his] person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole." (Doc. 50-2, p. 52). Special conditions were also attached to Keating's parole, including that he "shall submit to urinalysis testing" and

---

[2] The conditions of parole attached to Keating's deposition and incorporated into the record list his approved address as Minsec. This is the halfway house to which Keating was released when he started parole. (Doc. 50-2, p. 38). It is undisputed by the parties that at the time of the incident in question, the approved address for Keating on file with the Parole Board was 3 James Street, but that these conditions were still in place for Keating's parole, Parole No. 601AC. (Doc. 50-2, pp. 52-53).

"achieve negative results in screening tests… for the presence of controlled substances or designer drugs…" and that he "shall not consume or possess alcohol under any condition for any reason." (Doc. 50-2, p. 53).

The Home Provider Agreement gives the parole supervision staff the right to search the residence at any time when reasonable suspicion exists that conditions of supervision have been violated. (Doc. 50-2, p. 51). Additionally, the Home Provider Agreement signed for the 90 Market Street residence prohibits Keating from living in a residence with firearms, including look-alike firearms such as air rifles, starter pistols or toy guns. (Doc. 50-2, p. 51). When he signed the Home Provider Agreement on October 14, 2009, Keating agreed to these conditions.

Pennsylvania State Parole Agents have to approve the home plan. Parolee must have an approvable site to go to. (Doc. 58-2, p. 6). Agent Coslett believes that, as an agent, he has the power to take custody of a person and incarcerate them, and further that if a that he has the right to enter a parolee's residence if he has reasonable suspicion to believe that conditions of parole have been violated. (Doc. 58-2, pp. 6-8). If a parolee wishes to change anything on his home plan, including his approved residence, he needs to make a request of his agent, who would then conduct an investigation to approve the change. (Doc. 58-2, p. 7).

The undisputed facts in the record are as follows: On morning of October 14, 2009, Agent Coslett telephoned Keating to tell him he needed to collect a urine sample from him, and then proceeded to Keating's approved residence at 3 James Street. (Doc. 58-2, p. 10; Doc. 50-2, p. 39). Agent Coslett asked Keating where he was living, and Keating told him that he was living at 90 Market Street, and that all his belongings were there and that he was fixing it up. (Doc. 58-2, p. 10). The utilities were in Keating's name at the 90 Market Street residence, and he received mail there for the utilities. (Doc. 50-2, p. 40). Keating testified at his deposition that

the residence at 3 James Street was his primary residence, but that he also resided at 90 Market Street from 2007 until April 2012. (Doc. 50-2, p. 24). Keating testified that he was staying at 90 Market Street, on average once or twice a week. (Doc. 50-2, p. 48). Keating further testified in the same deposition that he had been primarily sleeping at the 3 James Street residence, but that he signed the new home agreement letter because Agent Coslett told him he would get "jammed up" if he did not sign it. (Doc. 50-2, p. 40). Agent Coslett informed Keating that staying at 90 Market Street was a violation of his parole because it was not his approved residence, and asked him if he wanted to stay at the Market Street address, and if that is where Keating wished to have his approved residence. (Doc. 58-2, p. 10).

Following the meeting at 3 James Street, Agent Coslett drove to the Market Street residence and met Keating, who had walked to the location. It is unclear from the record as to when Agent Coslett had Keating sign a new Home Provider Agreement for the 90 Market Street residence. Agent Coslett testified that he retrieved a home provider agreement letter and Keating signed the same prior to asking Keating to show him around the Market Street residence, which Keating agreed to do. (Doc. 58-2, p. 10). Keating testified that Agent Coslett presented him with the home agreement letter *after* Agent Coslett had searched the house for the first time, but before Tokar and Houssein got there. (Doc. 50-2, 35). Regardless, the home provider agreement letter doesn't address the violation of changing residence without permission; rather, it addresses to Keating what the rules of the residence will be if he was going to live at the residence. The agreement was signed at 9:13 a.m. (Doc. 58-2, p. 12).

Agent Coslett testified that he had reasonable suspicion to search the residence at 90 Market Street because of the change in residence without permission, which was a violation of Keating's conditions of parole. At the time Agent Coslett called the Pittston Police Department,

he intended to conduct a parole search of the Market Street residence. A parole search is a warrantless search that can be conducted by an agent whenever there exists reasonable suspicion that conditions of parole have been violated. (Doc. 58-2, p. 15).

At some point Agent Coslett secured a urine sample from Keating, which tested positive for morphine. (Doc. 58-2, p. 11). Keating told Agent Coslett he had used his mother's prescription without her permission, which was a violation of his parole. (Doc. 58-2, p. 11). Agent Coslett began his first search of the Market Street residence, with Keating showing him through the house. Francis Lombardo[3] was sleeping on the living room couch. (Doc. 58-2, p. 11).

Agent Coslett testified that he called his supervisor to advise him of the situation and to ask if there were any other agents in the area to assist him in searching the residence. His supervisor advised him that there were none in the area but to call the police for officer presence. (Doc. 58-2, p. 12). Agent Coslett also called the Pittston Police Department to request that an officer be dispatched to the Market Street residence as an officer safety precaution. (Doc. 58-2, pp. 11-13).

When Officers Tokar and Houssein arrived, Agent Coslett advised them that he was going to conduct a search and that Francis Lombardo was sleeping on the couch. At this point, the record is unclear as to what happened next. Agent Coslett testified that when he and the

---

[3] Francis Lombardo, Keating's cousin (Doc. 50-2, p. 40), had previously been convicted of several charges in the Court of Common Pleas of Luzerne County, Dkt. No. CP-40-CR-0002441-2008 (Doc. 50-3, p. 2). The arresting officer in his case was Officer Tokar. Agent Coslett was familiar with Lombardo's criminal history. (Doc. 50-2, p. 10). Officer Houssein was familiar with Lombardo's history, particularly with regard to his previous fights with the police, and had concerns over safety due to his presence at the residence. (Doc. 50-4, p. 22).

officers walked into the living room, Agent Coslett noticed that Lombardo had left. (Doc. 58-2, p. 16). Officers Tokar and Houssein testified that Lombardo was asleep on the couch when they entered the room, but that he was gone when they came back downstairs. (Doc. 58-2, pp. 24, 27, 33). Keating testified that Officers Tokar and Houssein went in the house first and started shouting "Gupper's gone" which prompted he and Agent Coslett to reenter the house, at which point Officers Tokar and Houssein both had their guns drawn. (Doc. 50-2, p. 28). Officer Houssein and Officer Tokar testified that they never drew their guns during the entire incident. (Doc. 58-2, pp. 24, 37).

Keating's whereabouts during the search of the residence by the officers and Agent Coslett are also in dispute. Keating testified that Agent Coslett instructed him to sit on the chair while one of the officers watched him while Agent Coslett and the other officer went to the second floor to make sure that Lombardo did not go up there. Officer Houssein testified that Keating came upstairs with him during the search. (Doc. 58-2, p. 35). Agent Coslett testified that he drew his gun at this point. (Doc. 58-2, p. 16).

Once Agent Coslett cleared the bathroom and the bedroom where Keating stayed, he heard a toilet flush. Officer Houssein testified that he was downstairs with Agent Coslett and Officer Tokar when they heard the toilet flush and that they went upstairs to see what was going on. (Doc. 58-2, p. 36). Agent Coslett went back to the bathroom and noticed Keating standing at the bathroom despite having been advised that he was to stay downstairs. Agent Coslett asked him what he was doing and told him he failed to follow the instruction to stay downstairs. He then proceeded to handcuff Keating. Agent Coslett asked Keating if he had any drugs on him. Keating said no, but Agent Coslett proceeded to search him for "obvious concerns." (Doc. 58-2, p. 16). Agent Coslett removed Keating's clothing, searched him, placed

6

all his clothing back on him, re-handcuffed him and he was taken back downstairs for observation by Officer Houssein. During the search of Keating's person by Agent Coslett, Officers Houssein and Tokar stood in the doorway or immediately outside the bathroom. (Doc. 58-2, pp. 17, 26; Doc. 50-2, p. 29). Neither Officer Tokar, Officer Houssein nor Agent Coslett touched Keating during the search, which lasted between five and ten minutes. (Doc. 50-2, p. 29). Officer Houssein took Keating downstairs and he stayed with Keating while Agent Coslett finished his search. (Doc. 58-2, p. 37).

At some point during one of the searches, Agent Coslett found a number of checks in Keating's bedroom made out to a Nicholas D'Amico. The name on the checks was not Keating. (Doc. 58-2, p. 11). Officers Houssein and Tokar both testified that Agent Coslett found the checks while they were present, but Agent Coslett recalled finding the checks during his initial search. (Doc. 58-2, pp. 26, 38). Agent Coslett questioned Keating about the checks and Keating told them he found them on the road but had forgotten to give them to his lawyer. (Doc. 58-2, p. 11). Agent Coslett also opened the refrigerator and saw what he believed to be alcohol, a parole violation. Keating asserts that what Coslett found was just mojito mix, and not alcohol. (Doc. 58-2, p. 11; Doc. 50-2, pp. 39-40).

In his second search, accompanied by the officers, Agent Coslett looked under the mattress and went through the dresser. He did not find anything of significant parole noteworthiness. (Doc. 58-2, p. 18). Officer Tokar described the search as "very controlled." (Doc. 58-2, p. 27). In the second bedroom, that which was used by Lombardo, Agent Coslett found prescription pills and a pellet gun, another violation of Keating's parole conditions. (Doc. 58-2, pp. 18-19; Doc. 50-2, p. 30).

After the search was completed, the handcuffs that had been placed on Keating were removed. Based on money and work Keating had put towards a degree at Penn State, Agent Coslett and his supervisor made the decision to sanction Keating for his parole violations and order him to the office for a supervisory conference the following week. Additionally, Keating was placed on a 6 p.m. curfew, but he was allowed to reside at the Market Street residence. (Doc. 58-2, p. 19).

Officers Tokar and Houssein never took Keating to the police station, and never put him in a police vehicle. (Doc. 50-2, p. 25). They did file charges against him by criminal complaint, for five counts of receiving stolen property. (Doc. 50-2, p. 26). Keating eventually plead guilty to these charges on December 9, 2009. (Doc. 50-2, pp. 27, 50).

II.   **MOTION FOR SUMMARY JUDGMENT STANDARD**

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury ... could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In making this determination, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.  DISCUSSION

#### A.  PLAINTIFF'S FOURTH AMENDMENT ILLEGAL ENTRY AND SEARCH AND SEIZURE CLAIM AGAINST AGENT COSLETT

Keating contends that Agent Coslett's warrantless entry, and the search and seizure that followed by Agent Coslett and Officers Tokar and Houssein, violated his Fourth Amendment rights. The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Warrantless searches are presumed unreasonable, unless an exception applies. *United States v. Crutchfield*, 444 Fed. Appx. 526, 528 (3d Cir. 2011); *citing Payton v. New York*, 445 U.S. 573, 585–86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The parole system is one such exception. *See Griffin v. Wisconsin*, 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *United States v. Hill*, 967 F.2d 902, 909–10 (3d Cir.1992). A parolee's privacy rights are not equal to

those held by the general public. *Samson v. California*, 547 U.S. 843, 857 (2006)(holding parolee's reasonable expectation of privacy severely diminished). The Third Circuit Court of Appeals has held that a parole agent does not need to show probable cause to obtain a warrant to search a parolee's home. *Hill*, 967 F.2d at 910. Rather, parole agents may conduct warrantless searches of parolees and their approved residences when reasonable suspicion of a violation exists. *Id*. When determining whether reasonable suspicion exists, the Court will consider the "totality of the circumstances" to determine whether the "officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); reasonable suspicion is a "particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity." Black's Law Dictionary (9th ed. 2009).

Pennsylvania courts have long concluded that a search warrant was not required when a parole officer searches a parolee's home. *Jarvis El v. Pandolfo*, 701 F. Supp. 98, 101-02 (E.D. Pa. 1988); citing *Commonwealth v. Brown*, 240 Pa.Super. 190, 361 A.2d 846 (1976). "One who has been placed on probation in being sentenced after conviction of a crime is as much under the supervision of the state as one who is sentenced to incarceration. A probation officer is entitled to search the belongings of such an individual to ensure that they do not reveal a violation of the terms of probation." *Commonwealth v. Devlin*, 294 Pa.Super. 470, 478, 440 A.2d 562, 566 (1982); see also *Commonwealth v. Brown*, 361 A.2d at 850 (when performing his normal duties, a parole officer is not required to obtain a search warrant); see also *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 3168 (1987) (probation is simply one point on a continuum of possible punishments). The Fourth Amendment rights of persons on probation or parole must give way to the necessity for ensuring that incarceration for some period is not necessary for the

protection of society. Pennsylvania has thus adopted the basic test that for a search to be reasonable, it must be based upon the probation or parole officer's reasonable belief that the search is necessary to the performance of his duties. 701 F. Supp. 98; cf. *United States v. Duff*, 831 F.2d 176, 179 (9th Cir.1987); *Latta v. Fitzharris*, 521 F.2d 246, 250–52 (9th Cir.1975) (en banc).

In *Shea v. Smith*, the Third Circuit addressed the issue of whether a probation officer can enter a third person's home if the probationer did not reside there. In doing so, the Third Circuit looked to a decision from the Ninth Circuit Court of Appeals:

> The court said, "If the police lack probable cause to believe the suspect is an actual resident, but have probable cause to believe he's present, they must get a search warrant." *United States v. Harper,* 928 F.2d 894, 896 (9th Cir.1991). This follows because the Supreme Court has held that an arrest warrant does not carry with it the authority to enter the home of a third person to seize a suspect and that to enter such a home police need to get a search warrant. *Steagald v. United States,* 451 U.S. 204, 222, 101 S.Ct. 1642, 1653, 68 L.Ed.2d 38 (1981). If police armed with probable cause cannot enter the home of a third party to seize a criminal suspect without a search warrant, then a probation officer cannot enter [a third party's] home to see if [the probationer] has violated a condition of probation, unless the officer reasonably believes that [the probationer] resides there.

*Shea v. Smith*, 966 F.2d 127, 131 (3d Cir. 1992).

Ultimately, in *Shea*, the Court determined that the probationer did reside in the home that was searched, as the homeowner admitted that the probationer resided in her home "approximately one-half of the time" and conceded that he spent three or four days per week in her house. Additionally, the probationer had listed the homeowner's address as his with the Probation Office. The Third Circuit concluded that there was no question that a reasonable police officer could have believed that the homeowner's residence that was searched was the probationer's residence. *Shea v. Smith*, 966 F.2d at 131; relying on *United States v. Harper*, 928

11

F.2d 894, 896-897 (9th Cir. 1991) (concluding that because the defendant entered the third party's home with his own key once or twice during a three day period police had "probable cause to believe that David resided there – but just barely.")

The Third Circuit has also concluded that officers may have "reasonable suspicion" to search a property to determine if a probationer violated the terms and conditions of his probation by failing to obtain approval before changing his residence. *United States v. Manuel*, 342 Fed. Appx. 844, 847-48 (3d Cir. 2009); relying on *Griffin v. Wisconsin,* 483 U.S. 868, 875–76 (1987); *see also* 61 Pa. Stat. § 331.27b(d)(2) ("A property search may be conducted by any officer if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or *other evidence of violations of the conditions of supervision.*") (emphasis added). In *Manuel*, the conditions of Manuel's release expressly provided that he could not change his residence without the permission of his probation/parole officer. The Third Circuit affirmed a finding by the District Court that the totality of the circumstances – including the two telephone calls from an anonymous informant reporting that Manuel was living at the Washington Street Address, and the fact that Officer Dowling corroborated this information by observing the name "T. Manuel" written on the mailbox outside of the residence, together with Manuel's having the keys in his possession – gave the officers probable cause to believe that Manuel resided at the Washington Street address. *See Motley v. Parks,* 432 F.3d 1072, 1080 (9th Cir.2005) (en banc) ("before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched"). *United States v.*

*Manuel*, 342 Fed. Appx. at 847.[4] As such, it appears that an officer must have probable cause to believe that a parolee is a resident of the house to be searched, but only needs reasonable suspicion to search a property to determine if a probationer violated the terms and conditions of his probation by failing to obtain approval before changing his residence. *Id.*

In this case, it is undisputed that Keating could not change his residence without the written permission of the parole supervision staff, and that Keating understood that to be a condition of his parole. (Doc. 58-2, p. 5, Doc. 50-2, p. 37). It is immaterial whether Keating signed the new home provider agreement before or after Agent Coslett's initial search of the property, as the agreement doesn't address the violation of changing residence without permission, it addresses to Keating what the rules of the residence will be if he's going to live at the residence. (Doc. 58-2, p. 12). It is also immaterial as to whether or not Keating was concerned about being "jammed up" or under any sort of duress when he signed the new home provider agreement. Material to the question of whether summary judgment should be granted in Agent Coslett's favor on Keating's illegal entry claim is whether Agent Coslett had probable cause to believe Keating was residing at his non-approved residence. Material to the question of whether summary judgment should be entered in Agent Coslett's favor on Keating's illegal search and seizure claim is whether Agent Coslett had reasonable suspicion to believe that

---

[4] In *Manuel*, the Third Circuit distinguished the facts of that case from those in the Pennsylvania Superior Court's decision in *Commonwealth v. Edwards*, 874 A.2d 1192 (Pa. Super. 2005), in which that court determined that the officers did not have probable cause to enter and search an unapproved residence where there was evidence presented to the officers prior to the search indicating that the parolee had a "vouched for explanation" for his presence at the location, and that the officer's sole basis for his suspicion was a tip from an informant who had proved to be unreliable in the past.

Keating had violated the conditions of his parole by residing in a non-approved residence (i.e. 90 Market Street). *See United States v. Manuel*, 342 Fed. Appx. at 847.

In this case, the Court finds that Agent Coslett did have probable cause to believe that Keating was residing at the residence at 90 Market Street, and not at his approved residence at 3 James Street. Under the Fourth Amendment, probable cause amounts to more than a bare suspicion but less than evidence that would justify a conviction. Black's Law Dictionary (9th ed. 2009). The record reflects the following undisputed facts on this issue: Agent Coslett asked Keating where he was living, and Keating told him that he was living at 90 Market Street, and that all his belongings were there and that he was fixing it up. (Doc. 58-2, p. 10). The utilities were in Keating's name at the 90 Market Street residence, and he received mail there for the utilities. (Doc. 50-2, p. 40). Keating testified at his deposition that the residence at 3 James Street was his primary residence, but that he also resided at 90 Market Street from 2007 until April 2012. (Doc. 50-2, p. 24). Keating further testified that he was staying at 90 Market Street, on average once or twice a week. (Doc. 50-2, p. 48). Additionally, Keating's own amended complaint avers that he "had permission from his parents to reside at the Market [S]treet residence, all utilities were paid by [Plaintiff] and in his name, [Plaintiff] slept and showered at the Market [S]treet residence, he even had appliances delivered to the residence." (Doc. 18, p. 1). The totality of these undisputed facts, including testimony from Keating himself, is enough for this Court to find Agent Coslett had probable cause to believe that Keating was residing, at least some of the time, at the 90 Market Street residence, in violation of the conditions of his parole. *Cf. United States v. Manuel,* 342 Fed. Appx. at 847 (two telephone calls from an anonymous informant reporting that parolee was living at the residence, and the fact that the officer observed the parolee's name written on the mailbox outside of the residence, together

with the parolee having the keys in his possession gave the officers probable cause to believe that parolee was using the property as his residence); *United States v. Harper*, 928 F.2d 894, 896-897 (9th Cir. 1991) (concluding that because the defendant entered the third party's home with his own key once or twice during a three day period police had "probable cause to believe that [he] resided there – but just barely.")

For these reasons, the Court finds that the undisputed facts in the record establish that Agent Coslett had probable cause to believe that Keating was residing at 90 Market Street. The Court turns next to the question of whether the undisputed facts in the record establish that Agent Coslett had reasonable suspicion of parole violations to conduct a search and seizure of the 90 Market Street residence, and of Keating's property and person.

The undisputed facts in the record material to the question of whether Agent Coslett had reasonable suspicion that Keating had violated the terms of his parole include the following: First, as a condition of his parole, Keating consented to the search of his person, property, and residence by parole agents without the need of a warrant as a condition of his parole. (Doc. 50-2, p. 52). Second, Keating was residing at an unapproved residence. This violation alone supports the existence of reasonable suspicion. *See United States v. Marcano*, 508 Fed. Appx. 119, 122 (3d Cir. 2013); *United States v. Manuel*, 342 Fed. Appx. 844, 847-48 (3d Cir. 2009) (officers had "reasonable suspicion" to search the Washington Street Address to determine whether Manuel had violated the terms and conditions of his probation by failing to obtain approval before changing his residence); *Griffin v. Wisconsin,* 483 U.S. 868, 875–76, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *see also United States v. Crutchfield*, 444 Fed. Appx. 526, 528 (3d Cir. 2011)(defendant conceded that agents had reasonable suspicion to believe that he had violated the conditions of his parole by living at an unapproved residence).

The undisputed facts in the record establish that Agent Coslett had reasonable suspicion to search the 90 Market Street residence. Moreover, once inside, the record reflects that Agent Coslett uncovered more potential parole violations which gave him reasonable suspicion to search and seize Keating's person and property. First, at some point during one of the searches, Agent Coslett found a number of checks in Keating's bedroom made out to a Nicholas D'Amico, which were not Keating's checks. (Doc. 58-2, p. 11). Agent Coslett also opened the refrigerator and saw what he believed to be alcohol, a parole violation. (Doc. 58-2, p. 11. In the second bedroom of the residence, Agent Coslett found prescription pills and a pellet gun, another violation of his parole conditions. (Doc. 58-2, pp. 18-19; Doc. 50-2, p. 30). As stated previously, as a condition of his parole, Keating consented to the search of his person and property without the need of a warrant. (Doc. 50-2, p. 52). After careful consideration, the Court finds that the undisputed record establishes that the search of Keating's person and property was based on reasonable suspicion by Agent Coslett and therefore did not violate Keating's Fourth Amendment rights. As such, and after construing all facts in a light most favorable to the Plaintiff, the Court recommends that Defendant Agent Coslett's motion for summary judgment be granted on Keating's Fourth Amendment illegal entry and illegal search and seizure claims.

  B. PLAINTIFF'S FOURTH AMENDMENT ILLEGAL ENTRY AND SEARCH AND SEIZURE CLAIM AGAINST OFFICERS TOKAR AND HOUSSEIN

Having determined that the undisputed facts in the record establish that the entry into the 90 Market Street residence, and subsequent search and seizure of Keating's person and property, were lawful and not in violation of any of Keating's Fourth Amendment rights, it is recommended that the motion for summary judgment of Defendants Officers Tokar and

16

Houssein also be granted. Moreover, in the case of Officers Tokar and Houssein, the record is devoid of the requisite personal involvement necessary to establish liability of a defendant in a civil rights case. A defendant in a civil rights action must have personal involvement in the alleged wrongs. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. *Rode*, 845 F.2d at 1207.

In this case, the record establishes that at the time of the search, Officers Tokar and Houssein were dispatched to the 90 Market Street residence at the request of Agent Coslett, for purposes of assisting him with a search of a residence for possible parole violations. (Doc. 58-2, pp. 11-13). Nothing in the record suggests that either officer might have been aware that the residence at 90 Market Street may not have been Keating's residence, or that Officers Tokar and Houssein did anything other than assist Agent Coslett at the residence by sweeping the residence for Lombardo and monitor Keating for a short period of time after he was handcuffed by Agent Coslett. (Doc. 58-2, pp. 16, 37). Agent Coslett was the individual who conducted the search of Keating's person and of the residence. (Doc. 58-2, pp. 17, 26; Doc. 50-2, p. 29).

For the forgoing reasons, it is recommended that this Court grant the summary judgment of Defendants Officers Tokar and Houssein.[5]

---

[5] All three Defendants have also moved for summary judgment on the grounds that they are entitled to qualified immunity. Having found that there was no constitutional violation committed by any of the Defendants, the Court will not address the question of qualified immunity.

IV. **RECOMMENDATION**

Based on the foregoing, it is recommended that the Court grant the Motions for Summary Judgment of Defendant Agent Coslett (Doc. 49) and Defendants Officers Tokar and Houssein (Doc. 45), in their entirety.

**BY THE COURT:**

**Dated: January 27, 2014**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARC KEATING,<br><br>          Plaintiff<br><br>     v.<br><br>FRANK COSLETT, et al.,<br><br>          Defendants | CIVIL ACTION NO. 3:11-CV-0411<br><br>(SLOMSKY, J.)<br>(MEHALCHICK, M.J.) |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **January 27, 2014**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: January 27, 2014**                                         *s/ Karoline Mehalchick*
                                                                                         **KAROLINE MEHALCHICK**
                                                                                         **United States Magistrate Judge**