IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARC KEATING,

Plaintiff,

v.

FRANK COSLETT, et al.,

Defendants.

CIVIL ACTION
NO. 11-0411

## OPINION

**Slomsky, J.**                                                                    **March 19, 2014**

### I.    INTRODUCTION

This case arises out of an October 2009 incident in which a Pennsylvania state parole

agent and two police officers allegedly entered the home of the father of Marc Keating

("Plaintiff" or "Keating"), searched the home, and then handcuffed and strip searched Keating,

who was present in the house. As a result of these events, on October 14, 2011, Keating filed a

pro se Amended Complaint against the City of Pittston, Pennsylvania State Parole Agent Frank

Coslett ("Agent Coslett"), Pittston City Police Officer Justin Tokar ("Officer Tokar") and Pittston

City Police Officer Maivaun Houssein ("Officer Houssein") (collectively referred to as

"Defendants").

In the Amended Complaint, Plaintiff alleges that his Fourth Amendment rights were

violated by Defendants' entry of the home and the ensuing search and seizure of Plaintiff, all

pursuant to 42 U.S.C. § 1983.[1]  (Doc. No. 18.)  On April 30, 2013, Officer Tokar and Officer

---

[1] On March 3, 2011, Plaintiff filed his original pro se Complaint. (Doc. No. 1.)  In that
Complaint, Plaintiff alleged that: 1) Officers Tokar and Houssein violated his Fourth Amendment
rights by entering his father's house at 90 Market Street; 2) Officers Tokar and Houssein violated
his Fourth Amendment rights by searching and seizing him; and 3) The City of Pittston failed to

1

Houssein filed a Joint Motion for Summary Judgment, seeking dismissal of the remaining claims

against them. (Doc. No. 45.)  The same day, Agent Coslett also filed a Motion for Summary

Judgment, seeking dismissal of the claims against him. (Doc. No. 49.)  Plaintiff opposed the

Motions. (Doc. Nos. 56-57.)  On January 27, 2014, the Magistrate Judge assigned to the case

issued a Report, recommending that Defendants' Motions for Summary Judgment be granted.

(Doc. No. 61.)  Plaintiff filed timely objections to the Magistrate Judge's Report and

Recommendation, and those objections are now before the Court for consideration.[2]  (Doc. No.

68.)

---

train its officers and was therefore liable for their misconduct under Monell v. Dep't of Soc.
Servs. of City of New York, 436 U.S. 658 (1978).  (Id.)  Plaintiff did not raise any claims against
Agent Coslett at this time.  On March 21, 2011, United States Magistrate Judge Thomas M.
Blewitt issued a Report, recommending that all of Plaintiff's claims be dismissed. (Doc. No. 10.)
On April 18, 2011, after considering Plaintiff's objections, this Court adopted and approved the
Magistrate Judge's Report and Recommendation, dismissing the Complaint.  (Doc. No. 14.)
Plaintiff was not given leave to amend the Complaint, and he appealed to the Third Circuit.

On October 5, 2011, the Third Circuit affirmed in part and vacated in part the Court's judgment,
remanding the case for further consideration.  (Doc. No. 17.)  Specifically, the Court of Appeals
found that Plaintiff should have been permitted to amend his claim that Officers Tokar and
Houssein violated his Fourth Amendment rights when they entered his father's house.  (Doc. No.
19-1 at 4.)  The Third Circuit also noted that Plaintiff should have been given leave to amend his
illegal search and seizure claim to include one against Agent Coslett and to add several
allegations about Officer Tokar's involvement in the alleged search and seizure.  (Id. at 4-5.)  The
Third Circuit affirmed the District Court's judgment with respect to Plaintiff's other claims,
including all claims against the City of Pittston.  Thereafter, Plaintiff retained private counsel to
represent him in this case.

[2] For purposes of this Opinion, the Court has considered the Amended Complaint (Doc. No. 18),
Defendants Tokar and Houssein's Joint Motion for Summary Judgment with related filings (Doc.
Nos. 45-47, 60), Defendant Coslett's Motion for Summary Judgment with related filings (Doc.
Nos. 49-51), Plaintiff's Responses in Opposition to the Motions (Doc. Nos. 56-59), Defendants
Tokar and Houssein's Joint Reply in Further Support of the Motion (Doc. No. 60), the Report
and Recommendation of United States Magistrate Judge Karoline Mehalchick (Doc. No. 61),
and Plaintiff's objections to the Report and Recommendation (Doc. No. 68).

2

## II.    FACTUAL BACKGROUND

The following factual account is taken from the Magistrate Judge's Report and

Recommendation:

> Defendant Frank Coslett is a Pennsylvania State Parole agent based out of the
> Scranton district office. (Doc. 58-2, p. 3). Defendant Justin Tokar, at all relevant
> times, was a police officer with the Pittston Police Department. Defendant
> Maivaun Houssein, at all relevant times, was a police officer for the Pittston
> Police Department. Plaintiff, Marc Keating, is an individual who, at all relevant
> times, was subject to parole supervision as a result of a criminal conviction and
> had an approved residence listed with the Pennsylvania Board of Probation and
> Parole as 3 James Street, Pittston, Pennsylvania. (Doc. 50-2, p.38).
>
> The conditions of Keating's parole included that his approved residence may not
> be changed without the written permission of the parole supervision staff. (Doc.
> 50-2, pp. 37, 52; Doc. 48-2, p. 3). Additionally, the conditions of Keating's parole
> include an express consent by Keating "to the search of [his] person, property and
> residence, without a warrant by agents of the Pennsylvania Board of Probation
> and Parole." (Doc. 50-2, p. 52). Special conditions were also attached to
> Keating's parole, including that he "shall submit to urinalysis testing" and
> "achieve negative results in screening tests . . . for the presence of controlled
> substances or designer drugs . . ." and that he "shall not consume or possess
> alcohol under any condition for any reason." (Doc. 50-2, p. 53).
>
> The Home Provider Agreement gives the parole supervision staff the right to
> search the residence at any time when reasonable suspicion exists that conditions
> of supervision have been violated. (Doc. 50-2, p. 51). Additionally, the Home
> Provider Agreement signed for the 90 Market Street residence[3] prohibits Keating
> from living in a residence with firearms, including look-alike firearms such as air
> rifles, starter pistols or toy guns. (Doc. 50-2, p. 51). When he signed the Home
> Provider Agreement on October 14, 2009, Keating agreed to these conditions.
>
> Pennsylvania State Parole Agents have to approve the home plan. Parolee must
> have an approvable site to go to. (Doc. 58-2, p. 6). Agent Coslett believes that, as
> an agent, he has the power to take custody of a person and incarcerate them, and
> further that . . . he has the right to enter a parolee's residence if he has reasonable
> suspicion to believe that conditions of parole have been violated. (Doc. 58-2, pp.
> 6-8). If a parolee wishes to change anything on his home plan, including his
> approved residence, he needs to make a request of his agent, who would then
> conduct an investigation to approve the change. (Doc. 58-2, p. 7).

---

[3] The 90 Market Street residence is Keating's father's residence where Keating alleges the civil
rights violations occurred.

The undisputed facts in the record are as follows: On [the] morning of October 14, 2009, Agent Coslett telephoned Keating to tell him he needed to collect a urine sample from him, and then proceeded to Keating's approved residence at 3 James Street. (Doc. 58-2, p. 10; Doc. 50-2, p. 39). Agent Coslett asked Keating where he was living, and Keating told him that he was living at 90 Market Street, and that all his belongings were there and that he was fixing it up. (Doc. 58-2, p. 10). The utilities were in Keating's name at the 90 Market Street residence, and he received mail there for the utilities. (Doc. 50-2, p. 40). Keating testified at his deposition that the residence at 3 James Street was his primary residence, but that he also resided at 90 Market Street from 2007 until April 2012. (Doc. 50-2, p. 24). Keating testified that he was staying at 90 Market Street, on average once or twice a week. (Doc. 50-2, p. 48). Keating further testified in the same deposition that he had been primarily sleeping at the 3 James Street residence, but that he signed the new home agreement letter because Agent Coslett told him he would get "jammed up" if he did not sign it. (Doc. 50-2, p. 40). Agent Coslett informed Keating that staying at 90 Market Street was a violation of his parole because it was not his approved residence, and asked him if he wanted to stay at the Market Street address, and if that is where Keating wished to have his approved residence. (Doc. 58-2, p. 10).

Following the meeting at 3 James Street, Agent Coslett drove to the Market Street residence and met Keating, who had walked to the location. It is unclear from the record as to when Agent Coslett had Keating sign a new Home Provider Agreement for the 90 Market Street residence. Agent Coslett testified that he retrieved a home provider agreement letter and Keating signed the same prior to asking Keating to show him around the Market Street residence, which Keating agreed to do. (Doc. 58-2, p. 10). Keating testified that Agent Coslett presented him with the home agreement letter after Agent Coslett had searched the house for the first time, but before Tokar and Houssein got there. (Doc. 50-2, 35). Regardless, the home provider agreement letter doesn't address the violation of changing residence without permission; rather, it addresses to Keating what the rules of the residence will be if he was going to live at the residence. The agreement was signed at 9:13 a.m. (Doc. 58-2, p. 12).

Agent Coslett testified that he had reasonable suspicion to search the residence at 90 Market Street because of the change in residence without permission, which was a violation of Keating's conditions of parole. At the time Agent Coslett called the Pittston Police Department, he intended to conduct a parole search of the Market Street residence. A parole search is a warrantless search that can be conducted by an agent whenever there exists reasonable suspicion that conditions of parole have been violated. (Doc. 58-2, p. 15).

At some point Agent Coslett secured a urine sample from Keating, which tested positive for morphine. (Doc. 58-2, p. 11). Keating told Agent Coslett he had used his mother's prescription without her permission, which was a violation of his parole. (Doc. 58-2, p. 11). Agent Coslett began his first search of the Market

4

Street residence, with Keating showing him through the house. Francis Lombardo[4] was sleeping on the living room couch. (Doc. 58-2, p. 11).

Agent Coslett testified that he called his supervisor to advise him of the situation and to ask if there were any other agents in the area to assist him in searching the residence. His supervisor advised him that there were none in the area but to call the police for officer presence. (Doc. 58-2, p. 12). Agent Coslett also called the Pittston Police Department to request that an officer be dispatched to the Market Street residence as an officer safety precaution. (Doc. 58-2, pp. 11-13).

When Officers Tokar and Houssein arrived, Agent Coslett advised them that he was going to conduct a search and that Francis Lombardo was sleeping on the couch. At this point, the record is unclear as to what happened next. Agent Coslett testified that when he and the officers walked into the living room, Agent Coslett noticed that Lombardo had left. (Doc. 58-2, p. 16). Officers Tokar and Houssein testified that Lombardo was asleep on the couch when they entered the room, but that he was gone when they came back downstairs. (Doc. 58-2, pp. 24, 27, 33). Keating testified that Officers Tokar and Houssein went in the house first and started shouting "Gupper's gone" which prompted he and Agent Coslett to reenter the house, at which point Officers Tokar and Houssein both had their guns drawn. (Doc. 50-2, p. 28). Officer Houssein and Officer Tokar testified that they never drew their guns during the entire incident. (Doc. 58-2, pp. 24, 37).

Keating's whereabouts during the search of the residence by the officers and Agent Coslett are also in dispute. Keating testified that Agent Coslett instructed him to sit on the chair while one of the officers watched him while Agent Coslett and the other officer went to the second floor to make sure that Lombardo did not go up there. Officer Houssein testified that Keating came upstairs with him during the search. (Doc. 58-2, p. 35). Agent Coslett testified that he drew his gun at this point. (Doc. 58-2, p. 16).

Once Agent Coslett cleared the bathroom and the bedroom where Keating stayed, he heard a toilet flush. Officer Houssein testified that he was downstairs with Agent Coslett and Officer Tokar when they heard the toilet flush and that they went upstairs to see what was going on. (Doc. 58-2, p. 36). Agent Coslett went back to the bathroom and noticed Keating standing at the bathroom despite having been advised that he was to stay downstairs. Agent Coslett asked him what he was doing and told him he failed to follow the instruction to stay downstairs. He then proceeded to handcuff Keating. Agent Coslett asked Keating if he had any drugs on him. Keating said no, but Agent Coslett proceeded to search him for "obvious concerns." (Doc. 58-2, p. 16). Agent Coslett removed Keating's clothing, searched him, placed all his clothing back on him, re-handcuffed him and he was taken back downstairs for observation by Officer Houssein. During the search of Keating's person by Agent Coslett, Officers Houssein and Tokar stood in the

---

[4] Francis Lombardo is Plaintiff's cousin.

doorway or immediately outside the bathroom. (Doc. 58-2, pp. 17, 26; Doc. 50-2, p. 29). Neither Officer Tokar, Officer Houssein nor Agent Coslett touched Keating during the search, which lasted between five and ten minutes. (Doc. 50-2, p. 29). Officer Houssein took Keating downstairs and he stayed with Keating while Agent Coslett finished his search. (Doc. 58-2, p. 37).

At some point during one of the searches, Agent Coslett found a number of checks in Keating's bedroom made out to a Nicholas D'Amico. The name on the checks was not Keating. (Doc. 58-2, p. 11). Officers Houssein and Tokar both testified that Agent Coslett found the checks while they were present, but Agent Coslett recalled finding the checks during his initial search. (Doc. 58-2, pp. 26, 38). Agent Coslett questioned Keating about the checks and Keating told them he found them on the road but had forgotten to give them to his lawyer. (Doc. 58-2, p. 11). Agent Coslett also opened the refrigerator and saw what he believed to be alcohol, a parole violation. Keating asserts that what Coslett found was just mojito mix, and not alcohol. (Doc. 58-2, p. 11; Doc. 50-2, pp. 39-40).

In his second search, accompanied by the officers, Agent Coslett looked under the mattress and went through the dresser. He did not find anything of significant parole noteworthiness. (Doc. 58-2, p. 18). Officer Tokar described the search as "very controlled." (Doc. 58-2, p. 27). In the second bedroom, that which was used by Lombardo, Agent Coslett found prescription pills and a pellet gun, another violation of Keating's parole conditions. (Doc. 58-2, pp. 18-19; Doc. 50-2, p. 30).

After the search was completed, the handcuffs that had been placed on Keating were removed. Based on money and work Keating had put towards a degree at Penn State, Agent Coslett and his supervisor made the decision to sanction Keating for his parole violations and order him to the office for a supervisory conference the following week. Additionally, Keating was placed on a 6 p.m. curfew, but he was allowed to reside at the Market Street residence. (Doc. 58-2, p. 19).

Officers Tokar and Houssein never took Keating to the police station, and never put him in a police vehicle. (Doc. 50-2, p. 25). They did file charges against him by criminal complaint, for five counts of receiving stolen property. (Doc. 50-2, p. 26). Keating eventually plead [sic] guilty to these charges on December 9, 2009. (Doc. 50-2, pp. 27, 50).

(Doc. No. 61 at 2-8 (emphasis in original).)

## III.    STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge

may designate a magistrate judge to file proposed findings and recommendations. Any party

may file written objections in response to those findings. Id. § 636(b)(1)(C). In the Middle

District of Pennsylvania, Local Rule 72.3 governs Plaintiff's objections to the Magistrate Judge's Report and Recommendation. Under this Rule, Plaintiff "shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections." Local R. Civ. P. 72.3.

Once objections are filed, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The judge] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The Third Circuit has "assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate [judge's] report before adopting it as the decision of the court." Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987); see also Bolt v. Strada, No.12-1599, 2013 WL 4500466, at *1 (M.D. Pa. Aug. 21, 2013).

IV.   ANALYSIS

Plaintiff filed objections to the Magistrate Judge's Report and Recommendation, arguing that the Magistrate Judge did not apply the correct summary judgment standard. Specifically, Plaintiff contends that in recommending that Defendants' Motions for summary judgment be granted, the Magistrate Judge resolved factual disputes in favor of the moving parties, rather than Plaintiff. (Doc. No. 68 at 3.) In her Report, the Magistrate Judge correctly noted the relevant summary judgment standards. (Doc. No. 61 at 8-9.) Importantly, in deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The question here is whether the

Report and Recommendation properly construes the facts in a light most favorable to Plaintiff.
The Court concludes that all three Defendants are entitled to summary judgment.

### 1. Plaintiff's Illegal Entry Claim

In Count I of his Complaint, Plaintiff alleges that on October 14, 2009, Defendants Agent
Coslett, Officer Tokar and Officer Houssein illegally entered his home without a warrant, in
violation of the Fourth Amendment. (Doc. No. 18 at 7-8.) The Magistrate Judge correctly noted
that under the Fourth Amendment, warrantless searches are presumed unreasonable unless an
exception to the warrant requirement applies. (Doc. No. 61 at 9 (citing United States v.
Crutchfield, 444 Fed. App'x 526, 528 (3d Cir. 2011).) The parole system is one of the exceptions
to the warrant requirement. For example, parole agents may conduct warrantless searches of
parolees and their residences when reasonable suspicion of a parole violation exists. United
States v. Davilla, 69 F. App'x 537, 539 (3d Cir. 2003); United States v. Hill, 967 F.2d 902, 910
(3d Cir. 1992). In determining whether Defendants violated the Fourth Amendment by entering
the residence at 90 Market Street without a warrant, the Magistrate Judge correctly explained
that "an officer must have probable cause to believe that a parolee is a resident of the house to be
searched, but only needs reasonable suspicion to search a property to determine if a probationer
violated the terms and conditions of his probation by failing to obtain approval before changing
his residence." (Doc. No. 61 at 13) (citing United States v. Manuel, 342 F. App'x 844, 848 (3d
Cir. 2009)).[5]

As of October 14, 2009, the day of the alleged violations, Keating's approved residence
was 3 James Street, Pittston, Pennsylvania. (Doc. No. 50 at ¶ 8; Doc. No. 58 at ¶ 8.) The parties
do not dispute that as condition of his parole, Keating could not change his approved residence

---

[5] The same standard applies to probationers and parolees. Davilla, 69 F. App'x at 539.

without permission of the parole supervision staff. (Doc. No. 58-2, Ex. B at 14:20-25; Doc. No. 50-2, Ex. B at 60:22-61:3.) Therefore, if Keating were residing at an unapproved residence, that would have been a violation of the conditions of his parole. Keating admits that he occasionally slept at the non-approved residence at 90 Market Street, while he was renovating it. (Doc. No. 58 at ¶¶ 10, 16.) He also admits that Agent Coslett was aware of this arrangement because Keating advised him about it. (Id.; Doc. No. 50-2, Ex. B at 106:13-25.) In fact, on the day of the incident, Agent Coslett met Keating at his approved residence on James Street to conduct a urine analysis, but they eventually went to the Market Street residence instead. Furthermore, Keating signed a new Home Provider Agreement for the Market Street residence that morning. The facts surrounding the signing of this agreement are in dispute, but the Court agrees with the Magistrate Judge that it is immaterial whether Keating signed the new Home Provider Agreement before or after Agent Coslett searched the Market Street residence. In any event, Agent Coslett did not need to rely on the new Home Provider Agreement in order to enter the Market Street residence. Instead, "[m]aterial to the question of whether summary judgment should be granted in Agent Coslett's favor on Keating's illegal entry claim is whether Agent Coslett had probable cause to believe Keating was residing at his non-approved residence." (Doc. No. 61 at 13.) See also Manuel, 342 F. App'x at 848 (explaining that probable cause is required to believe that a probationer resides at a particular location).

When determining whether probable cause exists, the Court must first "identify all of the relevant historical facts known to the officer at the time of the stop or search[.]" Ornelas v. United States, 517 U.S. 690, 701 (1996) (Scalia, J., dissenting). In her probable cause analysis, however, the Magistrate Judge considered some facts which Agent Coslett may not have known when he entered the Market Street residence. For instance, the Magistrate Judge considered the

fact that Keating had utility bills in his name for the Market Street residence. (Doc. No. 61 at

14.) While the parties do not dispute this particular fact, the record does not demonstrate that

Agent Coslett was aware of it at the time he entered the Market Street residence. (Doc. No. 50 at

¶ 11; Doc. No. 58 at ¶ 11.) Instead, this was a fact that came out during discovery, well after the

incident in question.

It is not disputed, however, that Keating advised Agent Coslett that he occasionally slept

at the non-approved Market Street residence while he was renovating it. (Doc. No. 50 at ¶ 14;

Doc. No. 50-2, Ex. B at 106:13-25; Doc. No. 58 at ¶¶ 10, 16.) Agent Coslett knew this fact on

October 14, 2009 when he entered the Market Street residence without a warrant. The question

then becomes whether this information gave Agent Coslett the necessary probable cause to

believe that Keating was residing there. Ornelas, 517 U.S. at 696. For probable cause to exist,

the available evidence must have provided Agent Coslett with reasonable grounds to believe that

Keating was residing at the Market Street residence. See Schneyder v. Smith, 653 F.3d 313, 323

(3d Cir. 2011) (explaining "probable cause" requirement). Because it is undisputed that Keating

himself informed Agent Coslett that he occasionally stayed at the Market Street residence, the

Court agrees with the Magistrate Judge that Agent Coslett had probable cause to believe that

Keating was residing there. Therefore, Agent Coslett did not need a warrant to enter the house

on Market Street, and the Magistrate Judge correctly recommended summary judgment on this

claim in favor of the three Defendants.

### 2. Plaintiff's Illegal Search Claim

In Count II of his Complaint, Plaintiff alleges that on October 14, 2009, Defendants

Agent Coslett, Officer Tokar and Officer Houssein illegally searched him and his property, in

violation of the Fourth Amendment. (Doc. No. 18 at 8-9.) As an initial matter, Keating

10

expressly consented to the search of his person, property and residence by parole agents without a warrant, as a condition of his parole. (Doc. No. 50-2, Keating Dep. Ex. 3.) Therefore, Agent Coslett did not need a warrant to search Keating's person or property. Furthermore, "[p]arole officers with reasonable suspicion may perform warrantless searches for the purpose of determining whether conditions of parole have been violated." United States v. Marcano, 508 F. App'x 119, 121 (3d Cir. 2013) (citing United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) ("'[N]o more than reasonable suspicion' is required to justify a search in these circumstances.") (quotation omitted)).

As noted above, the Magistrate Judge correctly explained that "[m]aterial to the question of whether summary judgment should be entered in Agent Coslett's favor on Keating's illegal search and seizure claim is whether Agent Coslett had reasonable suspicion to believe that Keating had violated the conditions of his parole by residing in a non-approved residence (i.e. 90 Market Street)." (Doc. No. 61 at 13-14.) See also Manuel, 342 F. App'x at 848 (explaining that only reasonable suspicion is needed to investigate a possible probation violation). In determining whether Agent Coslett violated Keating's Fourth Amendment right by searching the Market Street residence without a warrant, the Magistrate Judge relied on two facts: 1) the fact that Keating expressly consented to the warrantless searches as a condition of his parole; and 2) the fact that Keating informed Agent Coslett that he occasionally stayed at the Market Street residence. (Doc. No. 61 at 15.) Neither fact is disputed. Based on these undisputed facts, the Court agrees that Agent Coslett had a reasonable suspicion that Keating violated the terms of his parole by living at 90 Market Street. Therefore, Agent Coslett's warrantless search of the home did not violate the Fourth Amendment.

11

In addition to searching the Market Street residence, Agent Coslett also searched Keating's person. Again, as a condition of his parole, Keating expressly consented to the search of his person by parole agents without a warrant. (Doc. No. 50-2, Keating Dep. Ex. 3.) In this case, it is undisputed that Agent Coslett performed a strip search of Keating in the upstairs bathroom while Officers Tokar and Houssein stood at the threshold of the bathroom. (Doc. No. 46 at ¶ 29; Doc. No. 59 at ¶ 29.) Agent Coslett also conducted a visual cavity search of Keating at this time. (Doc. No. 58-2, Ex. B at 59:19-62:14; Doc. No. 50-2, Ex. B at 26:7-29:1.) It is also undisputed that neither Officer Tokar nor Officer Houssein took an active part in the search of Keating's person. Instead, these two Defendants stood at the threshold of the bathroom while Agent Coslett conducted the search. Officers Tokar and Houssein did not speak to Keating during the search, and neither officer put their hands on him. (Doc. No. 50-2, Ex. B at 28:15-23.) While both Officers testified that they did not observe anyone examining Keating's genital area, this seeming conflict between their testimony and that of Agent Coslett is not enough to create a genuine issue of material fact. (Doc. No. 58-2, Ex. C at 15:2-4; Doc. No. 58-2, Ex. D at 28:18-29:7.) Keating alleged that Agent Coslett was the one who searched him, and Agent Coslett's deposition testimony corroborates this allegation. Importantly, there is no dispute between Keating and Agent Coslett that a visual cavity search took place. Keating alleges that the strip search violated his Fourth Amendment rights.

In reviewing the Report and Recommendation, the Magistrate Judge did not fully discuss the allegations surrounding the search of Keating's person. Given the intrusive nature of this type of search, Keating's allegations about it "instinctively gives us the most pause." Bell v. Wolfish, 441 U.S. 520, 558 (1979). While the Court ultimately agrees with the Magistrate

Judge's findings, the Court will consider the evidence surrounding this allegation and whether

Keating's Fourth Amendment rights were violated.

During his deposition, Agent Coslett testified about the strip search of Keating in the

upstairs bathroom. The relevant testimony is as follows:[6]

> A:    I drew my gun and proceeded up the steps —
> Q:    Mm hm.
> A:    For obvious safety and security issues. Cleared the bathroom, went back
>       to the room where [Keating] was staying, then I believe I went to the next
>       room, we were clearing that room, and that's when I heard a toilet flush,
>       and the bathroom that I had already gone — that I had already passed and
>       looked in it and saw that there was nobody standing, I was alarmed, I ran
>       back to the — I didn't run back, I walked back to the bathroom and
>       noticed Marc Keating standing at the bathroom when he was advised to
>       stay downstairs with the officer. I asked Marc what you're doing here, he
>       — I don't know what his — what exactly he stated. And I said to him you
>       were instructed to stay downstairs, you did not follow the instruction, I
>       then proceeded to handcuff him, I asked him if he had any drugs on him,
>       he stated no, he then — I then proceeded to search him. I asked for one
>       officer to remain with me while I searched him for obvious concerns. Mr.
>       Keating was searched —
> Q:    Was he strip-searched?
> A:    He was yea — I removed all the articles of clothing from him, that is
>       correct.    That was — his articles of clothing were removed, after I
>       searched him all of his articles of clothing were placed back on by him, he
>       was re-handcuffed and taken back downstairs and placed in a chair to be
>       observed by the police officer.
> Q:    Who participated in the strip-search?
> A:    I don't know which officer did, one of the two, I'm not — I can't recall
>       which one was there, if both of them were there or I know that at least one
>       was there for my safety.
> Q:    Did you lift his testicles?
> A:    Did I?
> Q:    Yep.
> A:    No, I didn't touch his testicles.
> Q:    Did someone touch his testicles?
> A:    Nobody touched his testicles. If he did — well if we would search him,
>       we would ask him, he would — we would ask him and he would do it.
> Q:    Okay, did you?
> A:    I may have, I don't recall, but it's part of our procedure that —
> Q:    Did he bend over and spread his cheeks — could you view his anal cavity?

---

[6] In this transcript, the questions are being asked by Plaintiff's counsel.

13

A:      I — he — he would spread his cheeks normally yes, to make sure there
        was nothing in the — in the portion of his —
Q:      Anal area?
A:      Correct.

(Doc. No. 58-2, Ex. B at 59:19-62:14.) Despite having been told to wait downstairs, Keating

came up to the second floor bathroom. According to Keating, "he attempted to retrieve his cell

phone, looking for it in the bathroom where [he] had just showered and thought it would be

located." (Doc. No. 18 at ¶ 31.) When Agent Coslett found Keating in the bathroom after telling

him to remain downstairs, he believed that Keating might have been in possession of contraband

or trying to hide contraband. (Doc. No. 51 at 11.) The question is whether Agent Coslett had

reasonable suspicion to search Keating's person. The Court concludes that he did.

        As previously mentioned, Keating expressly consented to warrantless searches of his

person by parole agents as a condition of his parole. (Doc. No. 50-2, Keating Dep. Ex. 3.)

Furthermore, the Third Circuit "has decided that a parolee's expectation of privacy is less than an

average citizen's." United States v. Wingfield, 206 F. App'x 208, 210 (3d Cir. 2006) (citing Hill,

967 F.2d at 910). Moreover, in Newkirk v. Sheers, the Court explained:

> [I]n order to strip search [nonviolent or misdemeanor offenders], the arresting
> officers must have reasonable individualized suspicion that a detainee is carrying
> or concealing contraband. Individualized suspicion sufficient to warrant a strip
> search of such detainees may be based on such factors as the nature of the offense,
> the arrestee's appearance and conduct, and any prior arrest record.

834 F. Supp. 772, 788 (E.D. Pa. 1993) (internal citations omitted).

        In this case, Agent Coslett had a reasonable individualized suspicion that Keating was

carrying contraband or trying to hide it. Keating had a prior arrest record and was on parole at

the time of the strip search. Agent Coslett had already suspected that Keating had violated the

conditions of his parole by staying at an unapproved residence. In addition, Agent Coslett had

found potential evidence of a new crime when he found checks in Keating's bedroom that were

14

made out to someone else. Finally, despite Agent Coslett's instructions to remain downstairs,

Agent Coslett found Keating in the second floor bathroom after hearing the toilet flush. Given

these facts, Agent Coslett had reasonable suspicion to believe that Keating may be carrying

contraband or trying to hide it. Therefore, the strip search and visual cavity search of Keating

did not violate the Fourth Amendment.

### 3. Plaintiff's Illegal Seizure Claim

In Count II of his Complaint, Plaintiff alleges that on October 14, 2009, Defendants

Agent Coslett, Officer Tokar and Officer Houssein illegally seized him, in violation of the Fourth

Amendment. (Doc. No. 18 at 8-9.) Although Keating was not arrested on October 14, 2009,

Agent Coslett placed Keating in handcuffs and had him sit on a chair downstairs while Agent

Coslett searched the home for potential parole violations. (Doc. No. 18 at ¶ 37.) A Fourth

Amendment "seizure occurs '[w]henever an officer restrains the freedom of a person to walk

away.'" Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002) (quoting Tennessee v. Garner, 471

U.S. 1, 7 (1985)). A seizure is reasonable when, based on the totality of the circumstances, the

officer's "'actions [were] 'objectively reasonable' in light of the facts and circumstances'

confronting him, regardless of his underlying intent or motivation." Id. (quoting Graham v.

Connor, 490 U.S. 386, 396 (1989)).

In her Report and Recommendation, the Magistrate Judge found that "once inside [the

Market Street residence], the record reflects that Agent Coslett uncovered more potential parole

violations which gave him reasonable suspicion to . . . seize Keating's person . . ."[7] (Doc. No. 61

---

[7] In addition to finding checks made out to someone other than Keating in Keating's bedroom,
Agent Coslett also opened the refrigerator and saw what he believed to be alcohol, a parole
violation. (Doc. No. 58-2, Ex. B at 39:9-17; Doc. No. 50-2, Ex. B at 69:23-70:10.) Agent
Coslett also found prescription pills and a pellet gun in the second bedroom of the home, both of

15

at 16.)   Namely, it is undisputed that once Agent Coslett and Keating were inside the Market

Street residence, Agent Coslett found a number of checks in Keating's bedroom that were made

out to a man named Nicholas D'Amico.  (Doc. No. 18 at ¶ 17; Doc. No. 50 at ¶ 30; Doc. No. 50-

2, Ex. B at 23:6-19, 40:9-15.)  The checks were not made out to Keating, and Agent Coslett

believed that they could be contraband or evidence of another crime.  (Doc. No. 18 at ¶ 17.)

Because Agent Coslett reasonably believed that Keating had violated the conditions of his parole

by living at a non-approved residence and had also found evidence of a potential crime, the

Court agrees that it was reasonable for Agent Coslett to handcuff Keating and have him sit on a

chair downstairs while Agent Coslett finished searching the house.[8]   The temporary restraint of

Keating was also reasonable considering that Keating had previously ignored Agent Coslett's

instructions to remain downstairs.  Once the search was over, Agent Coslett removed the

handcuffs.  (Doc. No. 18 at ¶ 37.)  This seizure was reasonable under the totality of the

circumstances and therefore did not violate the Fourth Amendment.  Defendants are entitled to

summary judgment on this claim as well.  Because the Court has determined that Defendants did

not violate Keating's Fourth Amendment rights, the Court need not consider Defendants'

arguments that they are entitled to qualified immunity.[9]

---

which were violations of Keating's parole as well. (Doc. No. 58-2, Ex. B at 68:16-69:14; Doc. No. 50-2, Ex. B at 70:18-25.)

[8] Agent Coslett handcuffed Keating and placed him in the chair after he searched Keating's person in the upstairs bathroom.

[9] In resolving claims of qualified immunity, a court should consider: 1) whether the facts alleged or shown by plaintiff make out a violation of a constitutional right, and 2) whether that right was clearly established at the time of defendants' misconduct.  Pearson v. Callahan, 555 U.S. 223 (2009). As noted, since the facts do not establish a violation of a constitutional right, the qualified immunity claim need not be considered further.

## V.    CONCLUSION

The Magistrate Judge applied the correct summary judgment standards in her Report and

Recommendation.  For the reasons discussed above, the Court approves and adopts the

Magistrate Judge's Report and Recommendation, granting all three Defendants' Motions for

Summary Judgment.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARC KEATING,

Plaintiff,

v.

CIVIL ACTION
NO. 11-0411

FRANK COSLETT, et al.,

Defendants.

## ORDER

**AND NOW**, this 19th day of March 2014, upon consideration of the Amended Complaint (Doc. No. 18), Defendants Tokar and Houssein's Joint Motion for Summary Judgment with related filings (Doc. Nos. 45-47, 60), Defendant Coslett's Motion for Summary Judgment with related filings (Doc. Nos. 49-51), Plaintiff's Responses in Opposition to the Motions (Doc. Nos. 56-59), Defendants Tokar and Houssein's Joint Reply in Further Support of the Motion (Doc. No. 60), the Report and Recommendation of United States Magistrate Judge Karoline Mehalchick (Doc. No. 61), Plaintiff's objections to the Report and Recommendation (Doc. No. 68), and in accordance with the Opinion of the Court issued this day, it is **ORDERED** as follows:

1.  The Report and Recommendation of Magistrate Judge Mehalchick (Doc. No. 61) is **APPROVED** and **ADOPTED** as modified.

2.  The Joint Motion for Summary Judgment of Officers Tokar and Houssein (Doc. No. 45) is **GRANTED**.

3.  The Motion for Summary Judgment of Agent Frank Coslett (Doc. No. 49) is **GRANTED**.

1

4.      The Clerk of Court shall close this case for statistical purposes.

BY THE COURT:

*Joel Slomsky*

JOEL H. SLOMSKY, J.